## VERONICA KRAMER v. A. M. KRAMER AND ANOTHER.

162 N. W. (2d) 708.

November 15, 1968—No. 41125.

*Peterson & Challeen, Ltd.,* and *Duane M. Peterson,* for appellants.
*William A. Lindquist,* for respondent.

Heard before Knutson, C. J., and Nelson, Murphy, Peterson, and Frank T. Gallagher, JJ.

NELSON, JUSTICE.

Appeal from an order of the District Court of Winona County denying a motion for judgment notwithstanding the verdict or for a new trial.

Plaintiff, Veronica Kramer, brought this action against A. M. Kramer and Alfred B. Kramer, father and son, respectively. For a first cause of action she alleged that defendant A. M. Kramer was indebted to her in the sum of $4,500 for money had and received by him belonging to plaintiff, the same being her share of the consideration of $9,000 received for the sale and conveyance by plaintiff and her then husband, defendant Alfred Kramer, to one William D. O'Brien, of real estate in Hayward, Wisconsin, owned by plaintiff and Alfred as joint tenants. Plaintiff further alleged that although duly demanded, no part of the $9,000 paid by O'Brien had been given to her.

For a second cause of action, plaintiff alleged that on November 17, 1964, defendant A. M. Kramer promised her that if she and her husband would sell their interest in the Hayward land to O'Brien for $9,000 and apply the proceeds to the purchase of a home in Winona, he, A. M. Kramer, would place the title thereto in the names of plaintiff and her husband as joint tenants; that in consideration of this promise she signed the deed conveying the Hayward land and delivered the deed to A. M. Kramer; that although A. M. Kramer obtained the $9,000 consideration and purchased a home at 1630 Gilmore Avenue, Winona, "kitty-corner" from his own home, he took title to the Gilmore Avenue home in his own name and still continues to hold the sole title thereto, refusing to place the title in the names of plaintiff and Alfred Kramer, although duly demanded so to do. Plaintiff alleged also that the Gilmore Avenue real estate had a value of $19,000 and that she was damaged by A. M. Kramer's refusal to convey in the sum of $9,500.

Plaintiff's third cause of action alleged fraud by A. M. Kramer in inducing plaintiff to sign the deed conveying her interest in the Hayward

land—that at the time he promised to place the home to be purchased in Winona in her name and that of Alfred Kramer in joint tenancy, he had no intention of carrying out this promise, although he knew that plaintiff's signing and delivery of the Hayward deed was in reliance upon the promise and with the expectation that it would be carried out.

Plaintiff for another cause of action sought damages for alleged wrongful eviction from the 1630 Gilmore Avenue home by A. M. Kramer.

Based upon these causes of action, and two which were dismissed before trial, plaintiff demanded judgment against A. M. Kramer for damages, including punitive damages, and a determination that he held title to the Gilmore Avenue property in trust for plaintiff and Alfred Kramer, her former husband, and that she is now the owner in joint tenancy with her former husband of an undivided one-half interest therein.

Defendants served and filed separate answers to plaintiff's complaint, denying each cause of action separately and praying for judgment that plaintiff take nothing by her pretended and frivolous cause of action. They also, pursuant to Rule 56, Rules of Civil Procedure, moved for summary judgment in their favor on the grounds that there was no dispute as to any material fact and they were entitled to judgment as a matter of law.

The trial court after due consideration ordered that the motion for summary judgment be granted only with respect to two causes of action not detailed herein. Judgment of dismissal of these causes of action was entered September 27, 1967.

The record establishes the following facts. The first years of the marriage between plaintiff and Alfred Kramer were spent in Winona where he worked in his father's contracting and excavating business. They lived in a succession of three new homes in Winona owned by A. M. Kramer. The last of the three homes, located on Terry Lane, Winona, was deeded by A. M. Kramer to his son largely as a gift. In 1961 it was arranged that Alfred and his wife would sell the Terry Lane home and move to Hayward, Wisconsin, where they and A. M. Kramer would buy a bowling alley which Alfred and his wife, plaintiff, would operate. The Terry Lane home was sold for $17,500, and the proceeds were invested in the bowling alley business. Title to the bowling alley real estate was taken in the names of both defendants and later that same year Alfred, with his wife

joining, deeded their interest in the bowling alley to A. M. Kramer without consideration. Alfred and plaintiff lived on the bowling alley premises and operated the business for some two or three years when A. M. Kramer sold the business on contract. The building burned down, the contract buyer defaulted, and A. M. Kramer got the property back, rebuilt the bowling alley, and Alfred ran it again for a while until it was finally sold. When the business was sold the first time, Alfred Kramer and plaintiff purchased a home in Hayward for $7,500, taking title as joint tenants. The purchase money for this home was loaned by A. M. Kramer to Alfred, who gave his father a note, not signed by plaintiff, for the indebtedness. No mortgage was taken against the real estate. Plaintiff was unaware of any of the financing, and since Alfred did not want to run the bowling alley and his son Bobby was having trouble in school, they decided to return to Winona. Plaintiff and her sons moved to Winona in August 1964, taking up residence at 1630 Gilmore Avenue, this home being provided by A. M. Kramer, who bought it in August 1964. The home in Hayward was placed on the market for sale.

On November 17, 1964, plaintiff signed a deed conveying her interest in the Hayward property under the following circumstances: In the forenoon A. M. Kramer called plaintiff and said that the Hayward home had been sold and that they would have to go to the office of his attorney, Martin Beatty, to sign the papers. Those present at the office were Mr. Beatty, A. M. Kramer, and plaintiff. The attorney's wife was in the outer office. A. M. Kramer explained they wanted to sell the house in Hayward so the deed had to be signed by plaintiff. Plaintiff said to him, "I shouldn't sign these papers until I get the papers for the house I am living in now." A. M. Kramer responded, "Don't worry. Martin Beatty is making them up now." Plaintiff understood by this that the title to the home at 1630 Gilmore Avenue would be placed in the names of her husband and herself in joint tenancy, and according to her testimony she would not have signed the deed of the Hayward property if that statement had not been made.

The deed plaintiff then signed had been prepared in Hayward by Attorney Quentin Johnson and was mailed to Winona for execution. It is not clear whether this deed was mailed to A. M. Kramer or to Martin

Beatty, but it was not mailed to plaintiff. Beatty had been A. M. Kramer's attorney for many years. He did not represent plaintiff. The Hayward property was thereafter sold for $9,000 and the deed delivered. The $9,000 was paid by check to Alfred Kramer, plaintiff not being included as a payee. Alfred immediately endorsed the check and had Mr. Johnson mail most of the proceeds to his father, who applied the money for payment of the note given to him when the property was purchased. On several occasions thereafter plaintiff asked A. M. Kramer when they were going to get the papers for the house at 1630 Gilmore Avenue, Winona, but was told they were not yet ready.

While living in Hayward plaintiff and Alfred Kramer had marital trouble, twice separating. After her return to Winona, in October 1965, plaintiff commenced a divorce action against her husband which resulted in a divorce being granted to her in March 1966. She received no interest in the home at 1630 Gilmore Avenue, as the title was in the name of A. M. Kramer. After the divorce plaintiff received a letter dated April 18, 1966, from Mr. Beatty on behalf of A. M. Kramer, informing her she was a trespasser at 1630 Gilmore Avenue and must leave not later than April 30, 1966, but granting her permission to rent the property for one month at $65. Plaintiff paid the rent and continued to live on the premises until the children finished school, moving on June 9.

While A. M. Kramer purchased the Gilmore Avenue property August 28, 1964, he withheld the recording of this deed until December 31, 1964. On December 23, 1964, one week before this deed was recorded, A. M. Kramer and his wife executed a deed of this property to Alfred Kramer. The deed was prepared by Beatty and executed at his office. Beatty was instructed to attend to obtaining a homestead classification for the premises and he took the deed to the city assessor's office and exhibited it to the assessor, who made a photocopy of the deed for his file. The implied representation made was that the property had been sold to Alfred and he was then the owner thereof. Subsequently, on March 10, 1966, the assessor made an occupancy check of the premises and the homestead classification previously given the property was then continued. The deed of December 23, 1964, was never recorded and according to A. M. Kramer was destroyed. He first testified that he had destroyed the

deed immediately after the divorce became final, in March 1966, but later said that he had done so in July 1966. He also denied that he had instructed Mr. Beatty to obtain a homestead classification for the Gilmore Avenue house.

The jury found and brought in the following special verdict:

"Question No. 1: Is A. M. Kramer indebted to Veronica Kramer in the amount of $4,500 for a share of the proceeds from the sale of the Hayward house?

"Answer: No.

"Question No. 2: If the answer to Question No. 1 is 'No,' was there a contract entered into between A. M. Kramer and Veronica Kramer on November 17, 1964, whereby A. M. Kramer agreed to place title to the home at 1630 Gilmore Avenue, Winona, in the name of Veronica Kramer and Alfred B. Kramer as joint tenants in return for the deed to the Hayward house, said title to be free and clear of all encumbrances?

"Answer: Yes.

"Question No. 3: If the answers to Questions No. 1 and 2 are 'No,' then did A. M. Kramer fraudulently induce Veronica Kramer to sign the deed conveying the Hayward house on November 17, 1964?

"Answer—

"Question No. 4: Did A. M. Kramer own the house at 1630 Gilmore Avenue, Winona, at the time he evicted Veronica Kramer in June, 1966?

"Answer: Yes.

"Question No. 5: If the answer to Question No. 4 is 'No', what monetary damages resulted to Veronica Kramer as a result of the eviction?

"$—"

Defendants' post-trial motion included a prayer for a new trial on the ground that "the verdict appears to have been given under the influence of passion, bias and prejudice," a ground not within Rule 59.01(5), which reads, "Excessive or insufficient *damages*, appearing to have been given under the influence of passion or prejudice." (Italics supplied.) Defendants thus cannot under Rule 59.01(5) challenge the special verdict. Moreover, the amount of damages, should the jury find a contract had been entered into by plaintiff and A. M. Kramer, had been stipulated by the parties.

Defendants' motion for a new trial also included grounds as follows:

"Misconduct of counsel for the plaintiff in that his closing argument was inflammatory and designed to arouse the passion and prejudice of the jury."

It is contended on the part of plaintiff that this allegation upon the record herein is too general to be considered. See, Christopherson v. Custom Laundry Co. 179 Minn. 325, 229 N. W. 136. It would appear that the grounds for a new trial advanced by defendants' motion are therefore confined to the following:

"(a) The verdict is not justified by the evidence and is contrary to law."

"(d) Errors of law occurring at the trial and objected to at the time, including, but not limited to defendants' objections to the argument and the failure of the court to grant defendants' motion for mistrial or to give any cautionary instructions."

Pursuant to the special verdict, the court ordered that judgment be entered for plaintiff for $8,250, the amount stipulated as damages in the event that the jury found a contract had been made between plaintiff and A. M. Kramer (Question No. 2 of the special verdict).

On appeal defendants again urge that "[w]here the only proof in support of a verdict is contradictory, doubtful, discredited and inconsistent testimony of the plaintiff, which is otherwise uncorroborated," the verdict should not be allowed to stand.

Plaintiff in her brief rephrases this issue as follows:

"Where the jury has adopted plaintiff's version, should its verdict be rejected because of statements and acts of plaintiff prior to trial which might be considered inconsistent with her testimony, but where there is nothing inherently improbable in her testimony and circumstantial evidence provides corroboration?"

■■■ We have said that it is only in the clearest of cases where the facts are undisputed and it is clear that all reasonable men can draw but one conclusion from them, that the question for determination becomes one of law for the court. Kedrowski v. Czech, 244 Minn. 111, 126, 69 N. W.

(2d) 337, 346. In Majerus v. Guelsow, 262 Minn. 1, 6, 113 N. W. (2d) 450, 454, this court stated the rule to be as follows:

"Where one party moves for a directed verdict, he admits for the purposes of the motion the credibility of the evidence for the adverse party and every inference which may be fairly drawn from such evidence, and the most favorable aspect must be ascribed to the evidence of the adverse party. A verdict may be directed only in those unequivocal cases where it clearly appears to the court on the trial that it would be its manifest duty to set aside a contrary verdict as not justified by the evidence or as contrary to the law applicable to the case. If there is a question of fact, it creates a jury issue, and to direct a verdict would constitute reversible error. * * *

"On a motion for judgment notwithstanding the verdict the single question is whether there is any competent evidence reasonably tending to sustain the verdict. The motion should be granted only when it appears that the evidence is conclusive against the verdict."

See, Lee v. Smith, 253 Minn. 401, 92 N. W. (2d) 117.

In contending that the evidence here does not support the verdict, defendants rely upon Jeske v. Wolff Holding Co. 250 Minn. 16, 83 N. W. (2d) 729. There the plaintiff, who had fallen on some steps, claimed that an accumulation of leaves had caused him to fall. The court was impressed by the fact that the only evidence of these leaves was plaintiff's testimony and agreed with the trial court that "[h]is testimony is so uncertain and conflicting that a finding based thereon would be a mere guess." 250 Minn. 17, 83 N. W. (2d) 730. In his testimony at the trial the plaintiff first said he slipped on leaves, then said he did not know what he had slipped on, but reasoned that he must have slipped on them because other persons had told him that there were leaves there.

In contrast to the plaintiff's testimony in Jeske, the testimony of plaintiff in the instant case about the conversation at Mr. Beatty's office in which she received A. M. Kramer's assurance that the papers for the Gilmore Avenue house were being prepared, was positive and was not shaken on cross-examination. There appears to be neither uncertainty nor inconsistency in her testimony on this point.

The only evidence to the contrary was provided by defendants' witness, Attorney Beatty, and defendant A. M. Kramer himself. The jury might well have been justified in rejecting their testimony. Beatty had been A. M. Kramer's attorney for many years and had only a hazy recollection of the matter. It was also plainly evident that Beatty participated in and effected A. M. Kramer's plan to obtain homestead tax status on the Gilmore Avenue property while remaining in a position to assert ownership, an objective which the jury may well have considered dishonest. Beatty, after preparing and having the deed of A. M. Kramer to his son executed, exhibited the deed to the tax assessor, obviously representing it as a delivered deed and thus obtaining homestead tax status on the property. He then had only the deed to A. M. Kramer recorded, leaving the latter free to deny that the deed to his son was ever delivered. Under the circumstances Beatty may well have impressed the jury as almost too willing to help A. M. Kramer to be believed. The attempt to obtain homestead tax status also must have hurt the credibility of A. M. Kramer. His failure to own up to the scheme and his testimony he had not authorized Beatty to confer with the assessor may well have additionally damaged Kramer's credibility.

A. M. Kramer's claim that there was no connection between the Hayward deal and the deed of the Gilmore Avenue property to his son, his story about why he executed but did not deliver the Gilmore Avenue deed, and his testimony (impeached in some degree) about burning the deed to his son, were not convincing. His denial of plaintiff's testimony of the conversation was largely of the "I don't remember" type, and at no time did he deny that plaintiff afterwards repeatedly asked him about getting the deed to the Gilmore Avenue property.

There was nothing inherently improbable about plaintiff's testimony in that respect. It seems both probable and reasonable that she would not sign away a one-half interest in a home for nothing and would desire that title to the new home be held in the same way as in the previous home. The Terry Lane home had been owned by Alfred Kramer and the Hayward house was owned by Alfred and plaintiff. It would not be unreasonable of her to expect that the Gilmore Avenue house would be similarly owned.

Defendants insist that plaintiff's testimony is uncorroborated. In doing so they could well be overlooking a dominant, tangible, and acknowledged fact in this case—namely, that plaintiff owned an undivided one-half interest in the Hayward home and deeded her interest in this home away. Her testimony that when she deeded her interest she expected to receive something in return is most reasonable and likely. The corroboration that defendants claim is lacking appears with this uncontroverted circumstance. There is further corroboration in the undisputed fact that A. M. Kramer executed a deed to the Gilmore Avenue home shortly after the Hayward house was sold. The making of this deed, even though it was only to the son and according to A. M. Kramer was not delivered, lends credibility, we think, to plaintiff's testimony of the promise that title to the Gilmore Avenue home would be placed in the names of her husband and herself. The making of the deed to Alfred Kramer was performance of a part of the promise. The broken part of the promise may be found in A. M. Kramer's failure to name plaintiff in the deed and his alleged failure to deliver the deed. A. M. Kramer's conduct could be found to evidence an intention to prevent plaintiff from getting an interest in the home.

Defendants cite prior acts and statements of plaintiff, including her statement in the divorce action that there was no arrangement to buy the Gilmore Avenue house, as contradictory and inconsistent with her testimony at the trial. However, this circumstance does not directly and flatly controvert her testimony. The jury could find that there was no "arrangement to buy" the Gilmore Avenue house on installments or otherwise because it was supposed to have been deeded to plaintiff and Alfred Kramer. She so testified twice during the trial.

Defendants further state that plaintiff in her deposition agreed with their counsel's question that "all there were were vague promises and vague predictions." The record indicates that this statement may well have been made with reference to the fourth and fifth causes of action, which were dismissed, and not with reference to the Hayward and Gilmore Avenue houses. The jury was free to so decide.

Plaintiff's submission to eviction from the Gilmore Avenue house is understandable, since the house was, as far as she knew, still in A. M.

Kramer's name and she had been awarded no right in the house by the divorce decree. Her failure to raise the issue in the divorce action—used in an attempt to impeach her testimony in this action—may be explained by an omission in the preparation and trial of the divorce action to go into the facts of the real estate transaction in detail and by the further fact that A. M. Kramer was not a party to the divorce action. Her attorney's discovery of the copy of the deed in the assessor's office undoubtedly prompted investigation of the entire transaction, including the disclosure of the conversations and the ownership of the Terry Lane home, bowling alley, and Hayward home. Plaintiff is not well-educated, and under the circumstances shown in the record the jury may well have excused her for not bringing these facts to light earlier. There was no legal duty on her part to do so.

Even though there may have been some contradiction and inconsistency as claimed, the matter of plaintiff's credibility was still solely for the jury to pass upon. We have stated the rule to be:

"* * * Impeachment of witnesses by prior statements made or prior testimony given concerns their credibility and the weight to be given to their testimony and as such is a matter solely for the jury to pass upon with freedom to accept or reject the witness's testimony as the trier of fact." Zuber v. N. P. Ry. Co. 246 Minn. 157, 176, 74 N. W. (2d) 641, 655.

See, Manahan v. Jacobson, 226 Minn. 505, 33 N. W. (2d) 606; State v. Castle, 260 Minn. 293, 109 N. W. (2d) 593, certiorari denied, 368 U. S. 978, 82 S. Ct. 481, 7 L. ed. (2d) 439.

We said in Cameron v. Evans, 241 Minn. 200, 204, 62 N. W. (2d) 793, 796:

"* * * It is not uncommon for admissions, contradictions, and inconsistencies to appear in the testimony of witnesses during cross-examination even though the witnesses are entirely honest. However, in arriving at the meaning of the testimony of a witness and what it proves, the testimony must be examined and considered as a whole as brought out on both direct and cross-examination. Its meaning must be drawn from the entire testimony of the witness and not from isolated portions of it. * * *

It is for the jury, not the court, to determine the weight to be given to the testimony of a witness and to decide what the testimony of the witness proves."

Defendants claim that plaintiff's closing argument was so improper as to warrant the granting of a new trial. It must be taken into account, however, that defendants' counsel in their opening and closing statements ridiculed plaintiff by gratuitously entitling her case the "Disappointed Divorcee" and asserted in the closing argument that plaintiff was looking for "blood" to "suck." Defendants' counsel also recited irrelevant generosities of A. M. Kramer to plaintiff and her family over the years of her marriage to his son.

Plaintiff's attorney in his closing argument responded by referring to plaintiff's financial plight and suggesting that A. M. Kramer's financial position was much different.

This court made its attitude on the question of claimed improper argument known in Hardy v. Anderson, 241 Minn. 478, 483, 63 N. W. (2d) 814, 818, when it said:

"* * * In arguing to the jury it is elementary that counsel is entitled to present his client's case forcefully and fairly, and his efforts are not to be crippled by compelling him to run a course of technical hazards either when he draws factual inferences from conflicting evidence or when he applies the law to the facts as he, as an advocate, sees them. Although he may not strike foul blows, he may strike hard blows which are not always technically correct. Except in extreme cases, errors and omissions of counsel in discussing the applicable law or in the drawing of factual inferences are cured when the jurors are expressly instructed * * * that they are the exclusive judges of the facts and that their recollection of the facts must prevail over any contrary contentions of counsel and further that they must take and apply the law as given by the court and not as presented by counsel."

The court's charge included those cautionary instructions in this case. Since the matter of granting a new trial for improper remarks or argument of counsel is governed by no fixed rules but rests almost wholly in the discretion of the trial court, its action will be reversed on appeal only

for a clear abuse of discretion. Connolly v. The Nicollet Hotel, 258 Minn. 405, 104 N. W. (2d) 721. See, also, Patton v. Minneapolis St. Ry. Co. 247 Minn. 368, 77 N. W. (2d) 433, 58 A. L. R. (2d) 921; 14 Dunnell, Dig. (3 ed.) § 7102, and cases cited under note 23; 19 Id. § 9799.

It is significant also that the argument defendants complain of was based upon evidence adduced at the trial. Once evidence is in, it becomes part of the case and can be commented upon in the closing argument. In Rappaport v. Boyer & Gilfillan Motor Co. 239 Minn. 477, 483, 59 N. W. (2d) 302, 306, we said:

"* * * In the case at bar, the whole complaint was duly admitted without objection, and thus became proper evidence. Of course, comments of counsel in the closing arguments on properly received evidence is never error."

See, also, Kassmir v. Prudential Ins. Co. 191 Minn. 340, 254 N. W. 446; Pearson v. Northland Transp. Co. 184 Minn. 560, 239 N. W. 602.

■ Defendant A. M. Kramer complains of the argument that plaintiff was "dumped on the street with two children." The fact is that she and her two children were evicted from the home on Gilmore Avenue. He also complains that reference was made to plaintiff's receiving only $1,800 a year support for herself and two children, but this matter is also in the record. He complains of reference to her being defrauded of an interest in a house her husband owned. But it may be said that being defrauded of her marital rights was an issue in the case. The same defendant complains of reference to his free and easy dealing with his son and daughter-in-law's property. The record supports the inference, disclosing that A. M. Kramer gave his son the Terry Lane house and invested the $17,500 for which it was sold in the bowling alley; that he gave and took back a one-half interest in the bowling alley; that he did not object to plaintiff's receiving a one-half interest in the Hayward house, but he took most of the proceeds from the sale of it.

Clearly defendants' counsel was guilty of an improper statement in saying in the opening statement to the jury, "I have entitled this case the case of the 'Disappointed Divorcee.' " Defendants' closing argument was also improper in stating that from the testimony the jury might conclude

that "that statement was a rather accurate one in view of the manner in which this testimony has been presented."

The balance of the argument for the defense followed a similar strain. It could well be said in examining and weighing the arguments pro and con in the instant case that if there was anything improper in plaintiff's argument it was provoked or invited by the improper argument of defendants' counsel and comes within the rule of justifiable retaliation. This rule is well stated in Hinman v. Gould, 205 Minn. 377, 382, 286 N. W. 364, 366:

"* * * [W]here counsel in his closing argument pursues an improper line of argument which invites or provokes a reply, it is not reversible error if his adversary engages in similar argument in reply even though such argument might otherwise be objectionable."

This rule was applied in Hall v. Stokely-Van Camp, Inc. 259 Minn. 101, 106 N. W. (2d) 8. See, also, Frederick v. John Wood Co. 263 Minn. 101, 116 N. W. (2d) 88; James v. Chicago, St. P. M. & O. Ry. Co. 218 Minn. 333, 16 N. W. (2d) 188; Bush v. Havir, 253 Minn. 318, 91 N. W. (2d) 784; Murphy v. Barlow Realty Co. 214 Minn. 64, 7 N. W. (2d) 684.

Of considerable importance is the fact that the court submitted the case to the jury on special interrogatories. By their nature special interrogatories remove from the jury the temptation to exercise or engage in passion, bias, or prejudice. That is one of the purposes for using special verdicts. In McCourtie v. United States Steel Corp. 253 Minn. 501, 516, 93 N. W. (2d) 552, 562, this court stated:

"One purpose of the special verdict is to permit the jury to make findings of ultimate facts, free from bias, prejudice, and sympathy and without regard to the effect of their answers upon the ultimate outcome of the case. * * *

"* * * The controlling thought behind the special verdict 'is to free the jury from any procedure which would inject the feeling of partisanship in their minds, and limit the deliberations to the specific fact questions submitted.' "

Rule 61, Rules of Civil Procedure, provides that the court shall deny motions for granting new trials or setting aside verdicts "unless refusal

to take such action appears to the court inconsistent with substantial justice." We see no valid reason for disturbing the verdict in the instant case. Therefore, the judgment of the lower court is affirmed.

Affirmed.